# EXHIBIT A

# US Commercial Deposit Account Agreement

Please find enclosed the terms and conditions related to the Customer's Account with HSBC Bank USA, N.A. (the "**Bank**"):

1. The Master Services Agreement (including its Confidentiality and Regulatory Annex) ("**MSA**") applies to the Customer's overall relationship with the Bank. If the Customer already has an Account with the Bank, either in the United States or elsewhere, the Customer may already be familiar with the MSA.

2. The United States Country Conditions ("**USCC**") supplements the MSA for the Customer's Accounts in the United States only. Even if the Customer already has an Account with the Bank elsewhere, the Customer should review the USCC when opening an Account with the Bank in the United States.

3. The United States Account Disclosures ("**USAD**") sets out additional disclosures that apply to the Customer's Account in the United States. Even if the Customer already has an Account with the Bank elsewhere, the Customer should review the USAD when opening an Account with the Bank in the United States.

4. The E-Channels Security Measures, included in the Customer's pack when applicable, apply to the Customer's use of HSBCnet in any country or territory. If the Customer already has an HSBCnet profile, either in the United States or elsewhere, the Customer may already be familiar with these measures.

Depending on the Customer's account-related needs, certain additional terms, conditions and related information may also be enclosed.

Document Number: BCF-04US-210405-EN. HSBC Group © All rights reserved.



## 1   Relationship Documents

1.1   The Relationship Documents govern the provision of the Services. In the event of any conflict among the Relationship Documents, the following order of priority shall apply:

    (a)   the applicable Country Conditions;

    (b)   the applicable Supporting Documents;

    (c)   any relevant Appendix;

    (d)   any relevant Annex;

    (e)   any relevant Services Schedule; and

    (f)   the Terms.

1.2   In the event of any conflict between any of the terms of the Relationship Documents that rank equal in order of priority in accordance with Clause 1.1, the term which applies to a specific Service shall prevail in relation to the provision of that Service by the Bank to the Customer.

1.3   The Relationship Documents contain the whole agreement between the Parties relating to the transactions contemplated by the Relationship Documents and replace all previous agreements between the Parties relating to the Services and each Party confirms that in agreeing the terms of the Relationship Documents it has not relied on any express or implied warranties, representations, collateral contracts or other assistance made by or on behalf of the other Party unless set out in the Relationship Documents. Each Party waives all rights and remedies which, but for this Clause 1.3, might otherwise be available to it in respect of any such express or implied representation, warranty, collateral contract or other assurance. Nothing in this Clause 1.3 limits or excludes any liability for fraud.

1.4   In the Relationship Documents, references to the singular include the plural and vice versa. Clause headings are included for convenience only and do not affect interpretation. Unless otherwise defined in a Relationship Document, any capitalised term in the Relationship Documents shall have the meaning given to it in the Terms. Each reference to a document or agreement (whether online or in hard copy) is a reference to that document or agreement as amended or restated from time to time.

## 2   Authority

2.1   The Customer or any party duly authorised by the Customer to act on its behalf shall provide to the Bank documents identifying the Authorised Persons. The Bank is authorised to rely upon any such documents provided by any means, including electronically, and accepted by the Bank.

2.2   Subject to any written restriction received and accepted by the Bank, the Customer confirms that each Authorised Person shall be authorised to:

    (a)   perform all lawful acts on behalf of the Customer in connection with any Account or Service, including, but not limited to, opening, closing and operating Accounts, signing any agreements (including facility agreements), declarations or other documents relating to any Accounts or Services and execution of any guarantees, indemnities or other undertakings to the Bank;  and

    (b)   delegate their authority to perform such acts to any person indicated in any document provided to the Bank by any means, including electronically, and accepted by the Bank.

2.3   The Customer confirms that each Authorised Person is authorised to act as described in Clauses 2.2(a) and 2.2(b) until the Bank has received written notice, in form and substance acceptable to the Bank, of any change to an Authorised Person, or to a person to whom authority has been delegated in accordance with this Clause, and the Bank has had a reasonable opportunity to act on it.

## 3   Communications, Instructions and Security Procedures

3.1   The Parties will comply with the Security Procedures. The Customer shall follow the Security Procedures upon accessing communication channels provided by the Bank and issuing Instructions or Communications via such channels. The Bank shall follow the Security Procedures upon receipt of such Instructions or Communications to establish their validity.

3.2   The Bank is not obliged to do anything outside of the Security Procedures to establish and rely upon the authority or identity of any person sending an Instruction or Communication on behalf of the Customer. The Bank is not responsible for errors or omissions made by the Customer or the duplication of any Instruction by the Customer and may act on any Instruction by reference to a bank identification or account number only, even if a bank or account name is provided. An authenticated SWIFT message issued to the Bank in the name of the Customer (or of an entity authorised by the Customer to issue SWIFT messages on its behalf) may be relied on by the Bank as having been issued by an Authorised Person.

3.3   If the Bank doubts the legality, origination or authorisation of an Instruction, it shall take such steps as it considers appropriate to investigate the matter. If such investigation results or, in the opinion of the Bank, is likely to result in the Instruction being declined or executed outside the applicable value date or other agreed time period, the Bank will notify the Customer as soon as practicable, provided it is not prohibited from doing so by any law, regulation, order or Authority.

3.4   The Bank will use its reasonable efforts to comply with any request made by the Customer to vary or cancel an Instruction and, subject to the Bank using such efforts, the Customer shall be responsible for any Losses related to such an Instruction.

3.5   The Customer is responsible for the accuracy, completeness and correct transmission of its Instructions and for ensuring they will achieve the Customer's intended purpose, including when the Customer requests the Bank to forward information to a third party. The Bank will not be liable to the Customer where the Bank chooses to comply with such a request and the Customer must take reasonable steps to ensure that its request will not give rise to any claim against the Bank. If the Bank accepts a manually initiated Instruction (being an Instruction which is not submitted through electronic communication channels provided by the Bank, but, for example, by telephone, fax or physical delivery), then, provided the Bank acts in accordance with the applicable Security Procedures, the Customer is responsible for any Losses related thereto.

3.6   Without prejudice and subject to the foregoing provisions of Clause 3, if the Bank acts on an Instruction which the Customer claims was unauthorised, the Bank shall only be responsible for acting on such Instruction if:

    (a)   the Bank cannot demonstrate that it acted in accordance with the Security Procedures,  or

    (b)   the Bank demonstrates that it acted in accordance with the Security Procedures, but the Customer can demonstrate that the unauthorised Instruction was not caused by a person (i) entrusted at any time to act for the Customer with respect to Instructions or the applicable Security Procedures or (ii) who obtained access to the Customer's premises, equipment, systems or transmitting facilities or (iii) who obtained from a source controlled by the Customer, information (such as keys and passwords)

Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.



which facilitated breach of the Security Procedures.

Unless one of the conditions set out in paragraphs (a) and (b) of this Clause is satisfied, the Bank shall be entitled to enforce or retain payment from the Customer with respect to such an Instruction.

3.7 In some circumstances, Communications (including electronic mail, voicemail, SMS, telephone calls and website usage) as well as paper correspondence received by either Party such as envelopes or packages may be monitored, recorded or inspected (as appropriate) using monitoring devices or other technical or physical means. Such monitoring may take place where necessary insofar as required or allowed by and for purposes permitted by any applicable law, regulation, order or Authority from time to time, including, without limitation, to record evidence of business transactions and so as to ensure compliance with the Parties' respective policies and procedures. Subject to any applicable laws and regulations, all telephone conversations may be recorded by or for either Party without warning. Such records or recordings are and shall remain the sole property of the Party that made them and either Party may produce them as evidence in any proceedings brought in connection with the Relationship Documents.

3.8 Communication channels provided by the Bank may be suspended by the Bank for maintenance or for any other reason where it reasonably considers it necessary to do so. The Bank will provide the Customer with reasonable prior notice of the suspension where it is practical to do so.

## 4 Credits and Debits

4.1 If an Account is credited in error or in anticipation of receiving funds, where those funds are not received or the underlying funds transfer is reversed, the Bank may reverse all or part of such credit including any interest accrued thereon, make the appropriate entry to the Account, and, except in case of the Bank's error, debit or demand immediate repayment of any Losses incurred by the Bank in connection therewith, as appropriate.

4.2 The Bank is not obliged to carry out an Instruction which would result in a debit to an Account where this causes the Account to be overdrawn without the Bank's approval or to exceed any agreed or advised overdraft facility, or where the Account is subject to a right of a third party that has been enforced, such as a freezing order in favour of a creditor.

4.3 If the Customer gives Instructions which would result in multiple debits on an Account which would in aggregate cause the Account to be overdrawn or an agreed or advised facility to be exceeded, the Bank may decide the order in which to make those debits and whether to make any of them in whole or in part.

4.4 If an Account is overdrawn without the Bank's approval or if an overdraft limit is exceeded due to (i) any debit or (ii) such limit being withdrawn or varied by the Bank in accordance with applicable terms, the Customer shall immediately upon demand, or otherwise becoming aware thereof, transfer sufficient cleared funds to bring such Account into credit or within the overdraft limit. For the avoidance of doubt, the Bank is not hereby offering the Customer, or agreeing an increase to, any overdraft facility and, unless otherwise provided in an agreement executed by the Bank and the Customer, any extension of credit can be cancelled by the Bank at any time.

## 5 Statements

The Customer shall notify the Bank, as soon as practicable and in any case within 30 days of delivery of a statement of account or report of transactions, of any errors (including any errors arising as a result of fraudulent or unauthorised transactions) in that statement or report. If notice is received by the Bank after this time period, the Bank shall not be responsible for any Loss resulting from the delay by the Customer in providing such notice.

## 6 Interest

Any interest will accrue or, if applicable, be charged on the applicable credit balance of an Account on the days and at the applicable rate for those days as set out in any relevant guide or as the Bank may agree with the Customer from time to time. Unless agreed otherwise by the Parties, the Bank may change such rates and the Bank shall notify the Customer or otherwise make available such changes. The Customer acknowledges that, as applicable:

(a) interest payments made by the Bank may be made net of taxes and subject to deduction or withholding; and

(b) the Bank may debit from an Account any interest to be charged to such Account as and when due and such payment will be free of any deduction or withholding of tax or other charges so the Bank receives the full amount of such interest.

## 7 Security Interest

The Customer shall not grant any security interest over or transfer or assign its rights in connection with any Account without prior written consent from the Bank, such consent not to be unreasonably withheld or delayed.

## 8 Set-Off

The Bank may set off any of the Customer's obligations owed to the Bank that are due and payable against any obligations of the Bank owed to the Customer.

## 9 Representations, Warranties and Undertakings

9.1 Each Party represents and warrants, solely as to itself, that:

(a) it is duly incorporated or, if the Party is not a body corporate, is otherwise validly constituted and existing under the laws of the jurisdiction of its incorporation or constitution (as the case may be);

(b) it has all necessary corporate or equivalent power and legal capacity to execute (where applicable) and deliver, and to perform its obligations under, the Relationship Documents; and

(c) the execution and performance of the Relationship Documents by it will not violate its constitutional documents, organisational documents or bylaws, the terms of any material contract or other instrument (including, for the avoidance of doubt, any  trust instrument) to which it is a party or by which it is bound or any duty, obligation, limitation or prohibition imposed on it by any law or regulation applicable to it; and

(d) the terms of the Relationship Documents constitute legal, valid and binding obligations, enforceable against it.

9.2 Each Party furthermore warrants and undertakes to take all reasonable steps to ensure that its warranties and representations in Clause 9.1 shall remain valid and effective in all respects until such time as all Relationship Documents are terminated or expire in accordance with their terms.

9.3 A breach of Clause 9.1 or 9.2 shall constitute a material breach of the Relationship Documents. If a Party becomes aware that it is in breach of Clause 9.1 or 9.2 it shall notify the

Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.



other Party as soon as reasonably practicable.

9.4   The Customer undertakes to:

(a)   comply with all reasonable requests of the Bank necessary to provide the Customer with the Services, including but not limited to, promptly providing to the Bank all documents and other information reasonably requested by it from time to time in relation to any Account or Service; the Bank may rely on the documents and information provided until the Customer notifies the Bank in writing of any changes and the Bank has had a reasonable opportunity to act thereon; and

(b)   notify the Bank as soon as possible if it becomes aware of any theft, fraud, illegal activity, loss, damage or other misuse in relation to the Services or in relation to any associated documentation, Instruction, Communication or payment instrument.

9.5   Where multiple Customer Parties acting pursuant to an arrangement without separate legal capacity (such as participants in an unincorporated joint venture) are identified on an Application Form as joint holders of an Account and/or joint recipients of the Services, each Customer Party undertakes and agrees that:

(a)   it shall be jointly and severally liable with each Customer Party for any obligation owed by the Customer to the Bank or any other member of the Group under the Relationship Documents;

(b)   any demand, notice, agreement, Instruction or Communication given by the Bank to one or more Customer Parties, or received by the Bank from one or more Customer Parties, in connection with the Relationship Documents will be deemed to be a demand, notice, agreement, Instruction or Communication (as the case may be) given to or received from all Customer Parties;

(c)   if the Bank becomes aware of or reasonably suspects a dispute between any of the Customer Parties, the Bank may decline to act on any Instruction until all Customer Parties have confirmed the Bank's authority to act on it in form and substance satisfactory to the Bank;  and

(d)   to the extent any Customer Party ceases to exist for any reason, the Relationship Documents shall continue to bind the remaining Customer Parties.

9.6   The Bank undertakes to maintain a business continuity plan setting out contingency arrangements for the continuing performance of the Bank's services, including the Services, in the event of a Force Majeure Event. The Bank shall test and review such business continuity plan at least once in each calendar year.

## 10   Confidentiality and Data Protection

10.1   The Parties agree that Confidential Information shall be kept confidential, except as disclosed in accordance with the Confidentiality and Regulatory Annex.

10.2   The Parties will process and transfer Customer Information in accordance with the Confidentiality and Regulatory Annex.

## 11   Performance and Liability

11.1   The Bank will perform its obligations under the Relationship Documents using such level of skill and care as would be considered commercially reasonable by reference to the standards and practices of the banking industry.

11.2   Neither Party shall be liable for any:

(a)   consequential, incidental or indirect Loss including,

without limitation, fines, penalties or punitive damages; or

(b)   any direct or indirect loss of (i) profit (actual or anticipated), (ii) goodwill or (iii) business opportunity,

whether or not foreseeable, even if one Party advised the other of the possibility of such loss or damage.

11.3   Any obligation of the Bank with respect to an Account shall be enforceable only at the Bank or, where the Account is held at a branch of the Bank, such branch, which in each case, is the sole place of payment, and not at or against another branch or member of the Group.

11.4   The Bank is only required to perform its obligations in the currency in which those obligations are denominated. Unless otherwise agreed in writing, the Bank, or any intermediary reasonably selected by the Bank, may make any currency conversion in connection with the exercise of its rights and obligations pursuant to the Relationship Documents, using exchange rates that are reasonable in the relevant market at the time and for the size and type of foreign exchange transaction.

11.5   The Parties shall not be liable for any Loss caused by a Force Majeure Event. If either Party is prevented or delayed in the performance of any of its obligations under the Relationship Documents by a Force Majeure Event, such Party shall as soon as reasonably practicable notify the other of the existence of the Force Majeure Event. The Bank's duty or the duty of any member of the Group to act upon any Instruction or Communication, or perform any obligation, shall be suspended to the extent that and for as long as the Bank and/ or any member of the Group is prevented or restricted from doing so by a Force Majeure Event.

11.6   In providing the Services, the Bank may use certain Infrastructure Providers and the Services are therefore subject to the rules and regulations of those Infrastructure Providers as well as the guidelines and procedures of relevant regulatory or industry bodies. Neither the Bank nor any other member of the Group shall be liable for any Loss suffered as a result of the acts or omissions of an Infrastructure Provider, but will provide commercially reasonable assistance to the Customer in the recovery of any such Loss.

11.7   The Customer shall indemnify the Bank and any other member of the Group in full against any Loss arising from or in connection with a third party making a claim or demand against the Bank or other member of the Group as a result of the Bank or any other member of the Group processing an Instruction or otherwise performing its obligations hereunder in accordance with the Relationship Documents.

11.8   Neither the Bank nor any member of the Group is obliged to perform any of the Services or any other obligation under the Relationship Documents, including without limitation any obligation to give notice or provide information to the Customer, if to do so would result in the Bank or any member of the Group being in breach of any Law.

## 12   Fees and charges

12.1   The Customer shall pay to the Bank fees, costs, charges, interest and expenses in connection with the Services. These will be the Bank's standard fees and charges unless the Bank separately agrees different fees and charges with the Customer. Unless otherwise stated, all amounts payable pursuant to this Clause are exclusive of value added, sales, use, goods and services, business, stamp or any similar taxes or duties that may be applicable. All such taxes or duties will be applied in accordance with applicable legislation and the Bank will issue valid invoices or other documents as appropriate. The Bank may change the fees and charges either with reasonable notice to the Customer or immediately with

Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.



the Customer's agreement. Payment of all amounts due pursuant to this Clause will be clear and free of any deduction or withholding for or on account of tax, set-off, counterclaim or other charges so the Bank receives such amounts in full. If a deduction or withholding for or on account of tax is required to be made by law, the payment should be increased to an amount which after making any deduction or withholding leaves an amount equal to the payment which would have been made if no deduction had been required. The Customer shall make any payment required in connection with such tax deduction or withholding within the time allowed by law.

12.2 The Bank may debit fees, costs, charges, interest and expenses owed by the Customer to the Bank from any account advised by the Customer for such purposes. However, in the event of the Customer's breach of the Relationship Documents, the Customer's insolvency (which includes, where the Customer acts as a trustee, the insolvency of the trust and which may also include the Customer's bankruptcy in certain jurisdictions), or where acting in accordance with the Customer's advice is not possible, the Bank may debit fees, costs, charges, interest and expenses owed by the Customer to the Bank from any account the Customer has with the Bank. If the Customer fails to pay any amount due under the Relationship Documents, the Customer shall, to the extent permitted under applicable law, pay to the Bank interest and charges on the overdue amount at the rate the Bank determines, unless otherwise agreed, acting reasonably and in good faith.

## 13   Amendments and Assignment

13.1 If at any time the Bank makes amendments to terms governing the provision of services which include any of the Services to its customers generally or to customers belonging to the same market segment as the Customer, the Bank may, by written notice to the Customer, make the same (or substantially the same) amendments to the Relationship Documents. Such amendments will become effective on the expiry of no less than 45 days after delivery of such notice.

13.2 Notwithstanding the provisions of Clause 13.1, the Bank may, by written notice to the Customer, make amendments to the Relationship Documents at any time in order to comply with any law or regulation, which will become effective in accordance with the terms of such notice. The Bank will use reasonable efforts to give the Customer as much advance notice as possible in such circumstances.

13.3 Neither Party may assign its rights or transfer its obligations under these Relationship Documents without the written consent of the other, such consent not to be unreasonably withheld or delayed. However, the Bank may, without the Customer's consent, assign the Bank's rights and/or transfer the Bank's obligations to:

(a)   any member of the Group; or

(b)   to the Bank's successor following a merger, consolidation or disposal of all or substantially all of the Bank's shares, capital, assets or the business to which the Relationship Documents relate,

provided that such assignment does not adversely affect the provision of the Services to the Customer.

## 14   Termination

14.1 Either Party can terminate any or all Relationship Documents and/or, in the case of the Bank, withdraw any or all of the Services or close any Account by giving 30 days prior written notice to the other. Any liabilities owing to the Bank thereunder will become immediately due and payable on termination of the terms of the relevant Relationship

Document.

14.2 Subject to any applicable legal or regulatory restriction, either Party can terminate any or all Relationship Documents and/or, in the case of the Bank, withdraw any or all of the Services or close any Account immediately if:

(a)   the other Party commits a material breach of the Relationship Documents which is incapable of remedy or not remedied within a reasonable time period;

(b)   any step is taken by or in respect of the other Party for a moratorium, composition, compromise or arrangement with creditors, administration, bankruptcy, liquidation, dissolution (other than for the purposes of amalgamation or reconstruction), receivership, distress or execution, debt relief orders, interim orders or the other Party becomes insolvent (including, where a Party acts as a trustee, the insolvency of the trust and which may also include the Customer's bankruptcy in certain jurisdictions) or is deemed unable to pay its debts as they fall due, or anything analogous to the foregoing occurs in any applicable jurisdiction;

(c)   it is or may become unlawful for that Party to perform its obligations under any of the Relationship Documents or if to do so would result in that Party or, in the case of the Bank, any member of the Group, being in breach of any regulation or requirement or request of any governmental or other authority; or

(d)   the Customer has provided false or misleading information, or failed to provide Customer Information reasonably requested by the Bank, in connection with any know-your-customer or financial due diligence performed by the Bank or if otherwise required, in the Bank's reasonable opinion, in connection with any Compliance Activity.

14.3 Termination of the Terms by either Party shall have the immediate effect of terminating each of the Relationship Documents.

14.4 Termination shall not affect any accrued rights or liabilities of either Party nor shall it affect the coming into force or continuation in force of any other Clauses and provisions of the Relationship Documents which are expressly or by implication intended to come into force or continue in force on or after termination or expiry of the Relationship Documents including, without limitation Clauses 1, 3.5, 9.5, 10, 11, 13.3, 14.1, 14.4, 15-21 inclusive, and the Confidentiality and Regulatory Annex.

## 15   Waiver

In the event that any Party fails or delays to exercise a right under the Relationship Documents, that Party may still exercise that right later. Any waiver of any right shall be in writing and limited to the specific circumstances.

## 16   Severability

Each provision of the Relationship Documents is severable and if any provision is or becomes illegal, invalid or unenforceable in any jurisdiction or in relation to any particular Service, then that provision is severed only in that particular jurisdiction or in relation to that particular Service. All other provisions shall continue to have effect.

## 17   Third Party Rights

Any law, statute or regulation which may bestow upon a person who is not a Party the right to enforce any of the terms of the Relationship Documents shall be disapplied to the fullest extent permitted.

Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.



## 18 Notices

Notices in writing from the Bank shall be effective if delivered to an address specified by the Customer on an Application Form or to such other address as the Customer may specify in writing from time to time as effective for delivery of notices pursuant to the Relationship Documents, including an address for notices to be sent electronically. Notices in writing from the Customer shall be effective if delivered to the Bank's address specified on the most recent statement for the relevant Account or to such other address as the Bank may specify in writing from time to time as effective for delivery of notices pursuant to the Relationship Documents, including an address for notices to be sent electronically.

## 19 Governing Law and Jurisdiction

19.1 The Relationship Documents and any non-contractual obligations arising out of or in connection with them shall be governed by and construed in accordance with the law of the jurisdiction in which the relevant Account is maintained or the relevant Service is provided unless specified otherwise in any applicable Relationship Document.

19.2 Unless otherwise mutually agreed by the Parties, they submit to the non-exclusive jurisdiction of the courts of the jurisdiction whose governing law applies.

## 20 Counterparts

The Relationship Documents may be entered into by the execution of any number of copies of the relevant Application Form, all of which taken together shall form one document.

## 21 Definitions

- **Account** means any account which is to be opened or which has been opened by the Customer with the Bank under the Relationship Documents.

- **Annex** means an annex to a Services Schedule or the Terms which sets out additional terms in relation to the particular Services being provided.

- **Appendix** means an appendix to an Annex which sets out additional terms in relation to the particular Services being provided.

- **Application Form** means any form that must be completed to apply for the provision of a Service including without limitation the Relationship Acceptance Form and the Service Amendment Form.

- **Authorised Person** means any person identified to the Bank and authorised to act on behalf of the Customer in accordance with Clause 2.

- **Authority** means any judicial, administrative or regulatory body, any government, or public or government agency, instrumentality or authority, any Tax Authority, securities or futures exchange, court, central bank or law enforcement body, or any agents thereof, having jurisdiction over the relevant Party or a member of its group.

- **Bank** means the member of the Group that is or becomes a Party to the Relationship Documents and that provides the Customer with Services as specified in an Application Form.

- **Clause**, whenever used in a Relationship Document and not defined or identified otherwise therein, means a clause of that Relationship Document.

- **Communication** means communication (in any form) between Customer and Bank, but which shall not include Instructions.

- **Compliance Activity** means any activity performed by the Bank or any other member of the Group considered appropriate, acting reasonably, to meet Compliance Obligations relating to or in connection with the detection, investigation and prevention of Financial Crime, international and national guidance, relevant Group procedures and/or the direction of any public, regulatory or industry body relevant to any member of the Group.

- **Compliance Obligations** means obligations of any member of the Group to comply with: (a) Laws, or international guidance and the Bank's mandatory policies or procedures, (b) any demand from Authorities or reporting, regulatory trade reporting, disclosure or other obligations under Laws or (c) any Laws requiring the Bank to verify the identity of its Customers.

- **Confidential Information** means any information, about or relating to either Party or members of its group, received or accessed by the other Party in the course of the relationship established by them pursuant to the Relationship Documents, including without limitation, the business, operations, Personal Data or customers of the disclosing Party or members of its group and the provisions of the Relationship Documents.

- **Confidentiality and Regulatory Annex** means the Annex to the Terms which sets out each Party's obligations in relation to Confidential Information, Customer Information and tax compliance.

- **Connected Person** means a person or entity whose information (including Personal Data or Tax Information) is provided by, or on behalf of, the Customer to any member of the Group or otherwise received by any member of the Group in connection with the provision of the Services and any owner, controlling person, substantial owner or beneficial owner of the Customer in relation to whom the Bank considers, acting reasonably, Tax Information is required to be provided to any Tax Authority to comply with any Group member's Compliance Obligations.

- **Country Conditions** means, for each relevant jurisdiction, the specific terms which supplement and/or amend any Relationship Document.

- **Customer** means the Customer Party and, where there is more than one Customer Party, refers to the Customer Parties jointly and severally.

- **Customer Information** means Personal Data, Confidential Information, and/or Tax Information of or in relation to either the Customer or a Connected Person.

- **Customer Party** means an entity or person receiving the Services identified as a customer on an Application Form.

- **Data Protection Legislation** means all data protection, privacy and other laws to the same or similar purpose in all relevant jurisdictions applicable to a Party.

- **Financial Crime** means money laundering, terrorist financing, bribery, corruption, tax evasion, fraud, evasion of economic or trade sanctions, and/or violations, or attempts to circumvent or violate any laws or regulations relating to these matters.

- **Force Majeure Event** means any event beyond the reasonable control of a Party affecting that Party's ability to comply with the Relationship Documents, such as:

  (a) any natural event such as flood, storm or earthquake,

  (b) war, civil disturbance or act of terrorism,

Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.



(c)    industrial action,

(d)    Act of God,

(e)    action of a government or governmental agency,

(f)    change of law or regulation (or change in the interpretation of law or regulation),

(g)    power or equipment failure or interruption, or

(h)    interruption, failure or delay in receiving or acting on any Communication or Instruction caused by an Infrastructure Provider,

PROVIDED ALWAYS that any non-compliance with the Relationship Documents resulting from such an event could not be avoided by the exercise of commercially reasonable skill and care by the affected Party which, in the case of the Bank, may include invocation of the business continuity plan referred to in Clause 9.6.

• **Group** means HSBC Holdings plc, its subsidiaries, related bodies corporate, associated entities and undertakings and any of their branches.

• **Infrastructure Provider** means any third party providing shared market infrastructure necessary for a Party to perform its obligations under the Relationship Documents including any communications, clearing, settlement or payment system, or intermediary or correspondent bank.

• **Instruction** means any communication which is received by the Bank in relation to a Service which:

(a)    contains the necessary information for the Bank to carry out the payment or other act on the Customer's behalf; and

(b)    has or, in the reasonable opinion of the Bank, appears to have been provided by an Authorised Person.

• **Law** means any applicable local or foreign statute, law, regulation, ordinance, rule, judgment, decree, voluntary code, directive, sanctions regime, court order, agreement between any member of the Group and an Authority, or agreement or treaty between Authorities and applicable to the Bank or a member of the Group.

• **Loss** means any loss, damages, liability, costs, claims, demands and expenses of any kind whether or not foreseeable.

• **Party** means the Customer or the Bank, and **Parties** means the Customer and the Bank.

• **Personal Data** means any data relating to an individual and allowing the identification of that individual, and such other data which is protected by local Data Protection Legislation.

• **Purposes** means the circumstances in connection with which Customer Information will be processed, transferred and disclosed by the Bank and/or members of the Group, as set out in Clause 2.2 of the Confidentiality and Regulatory Annex.

• **Relationship Acceptance Form** means the Application Form in which the Customer agrees to the provision of the Services by the Bank.

• **Relationship Documents** means, separately and together, as the case may be:

(a)    the Terms,

(b)    any Services Schedules,

(c)    any Annexes,

(d)    any Appendices,

(e)    each of the applicable Country Conditions, and

(f)    the applicable Supporting Documents,

as amended or supplemented from time to time.

• **Security Procedures** means security measures or protocols governing the Customer's access to the communication channels made available to the Customer by the Bank from time to time and used to verify the origination of Instructions or Communications between them transmitted via such channels. A Security Procedure may include, but is not limited to, one or more of the following measures: encryption algorithms or other codes, user entitlements, identifying words and numbers, and similar security devices.

• **Service Amendment Form** means the Application Form in which the Customer agrees to the provision of any additional Services by the Bank at any time after the Relationship Acceptance Form has been executed.

• **Services** means the services provided by the Bank and members of the Group under the Relationship Documents and requested in an Application Form.

• **Services Schedule** means a schedule to the Terms or a separate agreement between the Parties that expressly incorporates the Terms and relates to a specific Service.

• **Supporting Documents** means any document, agreement or Application Form which the Bank requires the Customer to enter into in connection with the receipt or maintenance of any Services in a particular jurisdiction, other than Country Conditions, Appendices, Annexes, Service Schedules or the Terms.

• **Tax Authorities** means domestic or foreign tax, revenue, fiscal or monetary authorities.

• **Tax Information** means any documentation or information relating, directly or indirectly, to a Customer and any owner, controlling person, substantial owner or beneficial owner of the Customer, that the Bank considers, acting reasonably, is needed to comply with any Group member's obligations to any Tax Authority.

• **Terms** means this Master Services Agreement.

Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.



## 1  Disclosure of Confidential Information

1.1  Subject to Clauses 1, 2 and 6 of this Annex, the Parties agree that any Confidential Information shall be kept confidential. The Customer may disclose the Bank's Confidential Information as set out in Clause 1.2 of this Annex. The Bank may disclose the Customer's Confidential Information as set out in Clause 2 of this Annex.

1.2  The Customer may disclose the Bank's Confidential Information to:

(a)  members of its group and service providers, sub-contractors, agents, and any Infrastructure Provider provided always that the Customer may only make such disclosure on a confidential basis, and in connection with receipt of the Services under the Relationship Documents;

(b)  Authorities, auditors, professional advisers or as otherwise required or reasonably necessary under law, regulation, order of a court, or binding request from an Authority; and

(c)  any other person with the Bank's written consent.

1.3  Restrictions on the disclosure of Confidential Information by either Party shall not apply to information that:

(a)  is in or enters into the public domain other than in breach of the Relationship Documents;

(b)  is lawfully obtained by the recipient party from a third party or is already known by the recipient party, in each case without notice or duty to maintain it as confidential; or

(c)  was independently developed by the recipient party without reference to the disclosing party's Confidential Information.

## 2  Collection and Use of Customer Information (including Confidential Information)

2.1  Collection

Members of the Group may collect, use and share Customer Information, which may be requested from a person acting on the Customer's behalf. Customer Information may also be collected by or on behalf of members of the Group from other sources, and generated or combined with other information available to members of the Group.

2.2  Processing and Sharing

Customer Information will be processed, transferred and disclosed by the Bank and/or members of the Group in connection with the following Purposes:

(a)  the provision of services and as necessary for the Bank to approve, manage, administer or effect any transactions requested or authorised by the Customer;

(b)  meeting Compliance Obligations;

(c)  conducting Compliance Activity;

(d)  the collection of any amounts due and outstanding from the Customer;

(e)  conducting credit checks and obtaining or providing credit references;

(f)  to enforce or defend the Bank's, or a member of the Group's rights;

(g)  for internal operational requirements of the Bank or the Group (including, without limitation, credit and risk management, system or product development and planning, insurance, audit and administrative purposes); and

(h)  the maintenance of the Bank's overall relationship with the Customer.

By using the Services, the Customer agrees that the Bank may also, as necessary and appropriate for the Purposes, transfer and disclose any Customer Information to the following recipients globally (who may also process, transfer and disclose such Customer Information for the Purposes):

(a)  any member of the Group;

(b)  any sub-contractors, agents, service providers, or associates of the Group (including their employees, directors and officers);

(c)  in response to any requests from any Authorities;

(d)  persons acting on behalf of the Customer, Infrastructure Providers, payment recipients, beneficiaries, account nominees, intermediary, correspondent and agent banks, clearing houses, clearing or settlement systems, market counterparties, upstream withholding agents, swap or trade repositories, stock exchanges, and companies in which the Customer has an interest in securities (where such securities are held by the Bank for the Customer);

(e)  any party to a transaction acquiring interest in or assuming risk in or in connection with the Services; and

(f)  other financial institutions, credit reference agencies or credit bureaus, for the purposes of obtaining or providing credit references;

wherever located, including in jurisdictions which do not have data protection laws that provide the same level of protection as the jurisdiction in which the Services are supplied.

2.3        Protection of Customer Information

Whether it is processed in a home jurisdiction or overseas, in accordance with Data Protection Legislation, Customer Information will be protected by a strict code of secrecy and security which all members of the Group, their staff and third parties are subject to. Customer Information will be treated with the same degree of care that the Group exercises to protect its own Confidential Information of a similar nature.

2.4  Under relevant Data Protection Legislation, an individual has the right to request copies of certain categories of Personal Data which may be held and to request that any errors in such data are corrected.

## 3  Customer Obligations

3.1  The Customer confirms, warrants and has responsibility for ensuring that every person whose information (including Personal Data or Tax Information) they have provided to a member of the Group has (or will at the relevant time have) been notified of and agreed to the processing, disclosure and transfer of their information as set out in the Relationship Documents. The Customer shall advise such persons that they may have rights of access to, and correction of, their Personal Data.

3.2  The failure of a Customer to supply its, or its Connected Person's, Tax Information and accompanying statements, waivers and consents, as may be requested, may result in the Bank making its own decision with respect to the status of the Customer and/or its Connected Persons, including whether such Customer and/or its Connected Persons is reportable to a Tax Authority. Such failure may require the Bank or other persons to withhold amounts as may be legally required by any Tax Authority and paying such amounts to the appropriate Tax Authority.

Document Number: GC-2000-200330-EN. HSBC Group © All rights reserved.



## 4    Tax Compliance

The Customer acknowledges that it is solely responsible for understanding and complying with its tax obligations in all jurisdictions in which those obligations arise, and relating to the opening and use of accounts and/or services provided by the Bank and/or members of the Group. Except to the extent required otherwise by applicable law, the Customer shall be responsible for the deduction or withholding on account of any tax with respect to any amount paid, transferred or held by the Bank pursuant to any Service and shall be responsible for the payment and proper reporting of any such tax. The Customer confirms that, whenever required by applicable law and regulation, it has reported and will continue to report the assets deposited at the Bank and/or members of the Group as well as the income generated by those assets to the competent tax authorities.

## 5    Bearer Shares

5.1    Except to the extent that the Customer has either provided such confirmation to the Bank or received written confirmation from the Bank that it is on notice to the contrary, the Customer confirms on behalf of itself and any shareholder and affiliates (the "**Associated Entities**") that none of its shares or shares of Associated Entities have been issued in, or are held in a form that assigns or entitles ownership to whomever has possession of the physical share certificates, warrants or equivalent instruments ("**Bearer Shares**").

5.2    If the Customer or any of the Associated Entities issues, or converts existing shares to, Bearer Shares, the Customer undertakes to:

(a)    notify the Bank immediately and include the name of the beneficial owners of such Bearer Shares; and

(b)    comply with the Bank's requirements regarding issued Bearer Shares.

## 6    Compliance Activity

The provision of Services by the Bank and members of the Group may be affected by Compliance Activity and any impact on the performance of the Bank's obligations due to Compliance Activity or any actions taken by the Bank as a result thereof shall not constitute a breach of the Bank's agreements with the Customer.

## 7    Regulatory Disclosures

Where the Bank provides the Accounts and/or Services in the following jurisdictions, the Bank is required to provide the Customer with the following information:

**Algeria**

HSBC Bank Middle East Limited (Algeria Branch), Business District Algiers, Complèxe Immobilier Oriental Business Park, Bab Ezzouar, 16024, Algiers, is regulated by the Central Bank of Algeria and lead regulated by the Dubai Financial Services Authority.

**Bahrain**

HSBC Bank Middle East Limited (Bahrain Branch), P.O. Box 57, Manama, Kingdom of Bahrain, is licensed and regulated by the Central Bank of Bahrain as a Conventional Retail Bank and lead regulated by the Dubai Financial Services Authority.

**Egypt**

HSBC Bank Egypt S.A.E., PO Box 124, Maadi, Cairo, Egypt, is regulated by the Central Bank of Egypt.

**Kuwait**

HSBC Bank Middle East Limited (Kuwait Branch), P.O. Box 1683 Safat 13017, is regulated by the Central Bank of Kuwait, the Capital Markets Authority for licensed securities activities and lead regulated by the Dubai Financial Services Authority.

**Oman**

HSBC Bank Oman S.A.O.G., P.O. Box 1727, Postal Code 111, Seeb, Sultanate of Oman is regulated by the Central Bank of Oman and the Capital Market Authority, Oman.

**Qatar**

HSBC Bank Middle East Limited (Qatar Branch), P.O. Box 57, Doha, Qatar, is regulated by Qatar Central Bank and lead regulated by the Dubai Financial Services Authority.

**UAE**

HSBC Bank Middle East Limited (U.A.E. Branch), P.O. Box 66, Dubai, U.A.E., is regulated by the Central Bank of the U.A.E and lead regulated by the Dubai Financial Services Authority.

**United Kingdom**

HSBC Bank plc is a company registered and established in England and Wales under registration number 14259. The Bank's registered office is at 8 Canada Square, London E14 5HQ. The Bank's VAT registration number is GB 365684514. HSBC Bank plc is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority (the Bank's firm reference number is 114216).

Document Number: GC-2000-200330-EN. HSBC Group © All rights reserved.



The following terms and conditions ("**US Country Conditions**") amend and supplement the Master Services Agreement ("**MSA**") and form part of the Relationship Documents, which will apply to the provision of Services by the Bank to the Customer in the US only.

# 1   Account Provisions

## 1.1   Funds Transfers (Including ACH and RTP Payments)

The Customer may send and/or receive funds via Automated Clearing House ("**ACH**"), the RTP® system or wire (each, a "**Funds Transfer**") using eligible Accounts with the Bank. Funds Transfers (sometimes also referred to as "**Payment Orders**" or "**Instructions**") may be transmitted electronically via SWIFT® ("**SWIFT**"), HSBCnet, HSBC Connect, Clearing House Interbank Payments System, CHIPS®, Fedwire®, or another medium deemed acceptable by the Bank and the Customer. The Customer represents, warrants and covenants that each Payment Order it submits to the Bank and/or any Services it uses are and will be used solely for business or commercial purposes and not for any personal, consumer, family or household purposes.

The Bank must receive an Instruction by the cut-off time, where applicable, on any day except Saturday, Sunday or a US federal holiday (a "**Business Day**") for action on the date of receipt, unless a future value date is stated in the Instruction. The maximum future value date is thirty (30) Business Days from the date of receipt of an Instruction by the Bank. Instructions received for value on a non-Business Day will be processed on the next available Business Day. The Bank has not accepted an Instruction until the Bank executes it.

## 1.2   Security Procedures

The Security Procedures described in Clause 3 of the MSA are deemed to include the following Level One and Level Two procedures in the US, and the Bank requires a separate authorization and indemnity from eligible customers who seek to set up alternative (contingency) means for submitting manually initiated Instructions to the Bank outside of these procedures. For purposes of clarity, the Security Procedures are not used to detect an error in the electronic transmission or the content of a Payment Order. The Customer acknowledges and agrees that the Security Procedures are commercially reasonable and adequate for the Customer's purpose. The Customer and the Bank agree that the Security Procedures are considered "**Confidential Information**" under the Confidentiality and Regulatory Annex to the MSA.

(i)   Level One

(a)   E-Channels (HSBCnet and HSBC Connect)

HSBCnet and HSBC Connect are HSBC's secured delivery channels, also referred to as E-Channels. HSBCnet and HSBC Connect's encryption systems encipher information transmitted from the Customer's computer to the Bank. In general, the Security Procedures include access controls, such as an identification code and a confidential password that allows the Customer to access the Funds Transfers system, and also include encryption of a Payment Order during the process of transmission to the Bank (these procedures are more specifically described in the HSBCnet and HSBC Connect informational guides that are available from the Bank).

(b)   Authenticated SWIFT messages

The Security Procedures for authenticating Instructions sent through SWIFT are explained in the SWIFT Handbook as well as in guidelines established for Relationship Management Application ("**RMA**") and issued by SWIFT.

(ii)   Level Two – Call Back Procedures

Level Two Call Back Procedures may be agreed between an eligible Customer and the Bank, subject to a separate authorization and indemnification agreement (as the same may be modified from time to time by the Bank, an "**Indemnity Agreement**") and must involve the use of a call-back procedure by the Bank and/or the use of an identification code by the Customer (or its authorized users). If the Bank agrees to accept a Payment Order by means other than through HSBCnet, HSBC Connect, or SWIFT, and the Customer communicates a Payment Order to the Bank in writing including via an emailed PDF or telephone facsimile, the Customer has rejected Level One Security Procedures and has chosen Level Two Security Procedures generally described herein, and as specified in the Indemnity Agreement. Call-back Security Procedures may be used for the purpose of verifying that a Payment Order or other Instruction amending or cancelling a Payment Order was authorized and issued by the Customer. An amendment or cancellation Instruction must be transmitted to the Bank using the same or higher level of Security Procedure as used by the Customer for the original Payment Order.

## 1.3   Routing of a Payment Order

In requesting a Payment Order, the Customer is responsible for providing full routing instructions. If the Customer fails to provide such information, the Customer agrees that the Bank may choose an intermediary bank and/or Funds Transfer system through which to route the Payment Order. If any of the Customer's Payment Orders designates an intermediary bank and/or Funds Transfer system, the Customer agrees that, where appropriate, the Bank may select a different intermediary bank and/or Funds Transfer system. The Customer acknowledges that the Bank is not acting as the Customer's agent in routing Payment Orders.

With respect to Payment Orders involving transfers between accounts denominated in different currencies, the Bank may route such payments through an intermediary bank (which may be a member of the Group). The intermediary bank may (but is not obligated to) convert the payment from the currency of the Customer's Account to the currency of the account of the beneficiary. If such conversion is made, it will be at a rate (chosen by the intermediary) which will be the prevailing market rate plus a margin.

## 1.4   Notice of Receipt of ACH Payments, RTP and Wire Payments

The Bank will not be obligated to notify the Customer each time the Customer is the recipient or beneficiary of an ACH, RTP or wire payment.  The posting of payments to the Account will be reflected in the Customer's HSBCnet or other online Account and the periodic statements the Bank provides to the Customer.

## 1.5   Daily Settlement Limits

In the event that the Bank implements its resolution plan or other potential resolution scenario, the Bank could face significant liquidity pressures. Under such conditions, the Bank may discontinue or limit intraday credit, which helps facilitate payment and settlement activity, or the Bank may require prefunding of certain payment transactions. It is important for the Customer to consider the potential impact of such a resolution scenario, including the need to: (i) maintain sufficient

RTP and CHIPS are registered trademarks or service marks of The Clearing House Payments Company L.L.C
NACHA is a registered trademark of the National Automated Clearing House Association
Fedwire is a registered trademark or service mark of the Federal Reserve Banks

SWIFT is a trademark of S.W.I.F.T. SCRL

Document Number: CC-01US-210405-EN. HSBC Group © All rights reserved.



funds with the Bank to prefund the Customer's payment and settlement activity; and/ or (ii) establish relationships with alternative payment or settlement providers, as applicable, that may continue to extend intraday credit and process payment transactions without a pre- funding requirement.

**2   Law and Jurisdiction**

2.1   The Relationship Documents and all non-contractual obligations arising out of or in connection therewith and all Services will be governed by and construed in accordance with the New York State Law, including Articles 3, 4, and 4A of the NY Uniform Commercial Code, clearing house rules, including National Automated Clearing House Association ("**NACHA®**") rules and Electronic Payments Network Operating Rules, rules governing the RTP System, as defined below (the "**RTP Operating Rules**") and general commercial banking practices, as applicable to the Services (each an "**Applicable Rule**" and collectively, the "**Applicable Rules**").  The Applicable Rules are incorporated herein by reference and made a part hereof.  The Relationship Documents are further subject to all applicable US Federal laws and regulations. If the Relationship Documents conflict at any time with any applicable Law, the Relationship Documents will be considered changed to the extent necessary to comply. In providing Accounts and/or Services under the Relationship Documents, the Bank operates solely in a non-fiduciary and non-advisory capacity.

The Customer's compliance with Law and Applicable Rules is the Customer's responsibility. The Bank may conclusively presume that the Customer's statements and actions are in conformity with Law and Applicable Rules without further inquiry, including, specifically, any program administered by the US Department of the Treasury's Office of Foreign Assets Control and the Financial Crimes Enforcement Network.

2.2   The Customer agrees to bring any claims or legal action relating to the Services in writing within one (1) year of the date the problem occurred, unless the Relationship Documents, Applicable Rules or Law require earlier action by the Customer. If the problem involves a series of events, the Customer agrees that the date the first event occurred will be the date by which the period to make any claim or bring any legal action begins to run.

2.3   The Customer agrees in the event of any claim arising from or relating to the Services, to cooperate and assist the Bank and any law enforcement authorities in connection with any investigation and prosecution of any suspected wrongdoer. The Customer understands and agrees that failure to cooperate may result in the Bank, in its sole discretion, dishonoring any claim the Customer has made.

2.4   The parties agree to waive any right they may have to a (i) class action; or (ii) jury trial in any action for claims that may arise from or relate to the Services.

**3   Force Majeure**

Clause 11.5 of the MSA is supplemented with the following: "For the avoidance of doubt, if the Customer fails to comply with the Relationship Documents due to a Force Majeure Event, the Bank will not be liable for any Loss arising from such failure."

**4   Assignment**

Clause 13.3 (b) of the MSA is deleted and replaced with the following: "to the Bank's successor following a merger, consolidation or disposal of any portion(s) of all or substantially all of the Bank's shares, capital, assets, division(s), branch(es), or the line of business to which the Relationship Documents relate."

**5   Fees**

All Terms and Charges Disclosures and similar fee schedules (collectively, "**Terms and Charges**") applicable to the Services are incorporated into these US Country Conditions. In the event of any conflict between the Terms and Charges and any other provisions of the US Country Conditions, the Terms and Charges will control.

**6   Email Authorization**

The Customer authorizes the Bank to accept instructions and documents via a secured email system or other electronic platform acceptable to the Bank to open, manage and close accounts on behalf of the Customer and to add, modify and terminate any services relating to such accounts. By submitting a request to the Bank via secured email or other electronic platform acceptable to the Bank, the Customer agrees that the Bank may treat any scanned documentation or instruction sent to the Bank via secured email or other electronic platform as if it were an original document signed by the Customer. The Customer represents and warrants that such documentation has been duly authorized by the Customer and shall be enforceable against the Customer. The Customer agrees to promptly provide the Bank with any additional documentation reasonably requested by the Bank, including originals of the scanned documents sent via secured email or other electronic platform. The Customer acknowledges that for certain documents an original may be required by the Bank.

In providing instructions and scanned documentation to the Bank hereunder, the Customer acknowledges the risk of sending such instructions and documentation via email and other electronic platforms and agrees to take appropriate measures, including any reasonable security measures advised by the Bank, to increase security, which may include safeguarding passwords, logging out of sessions, locking computer screens, using email encryption and not sending sensitive information from a public computer.

**7   General**

Nothing in the Relationship Documents is intended to cause the Bank to have any liability or responsibility for its affiliates in violation of Federal Reserve Board Regulation W.

**The Customer may have access to the following Services as part of the Customer's Account, in which case the following terms and conditions will apply:**

**8   RTP Payments**

8.1   General Description of Service

The following additional terms apply to any RTP Payments the Bank sends from, or receives for credit to, an Account through the RTP System. The RTP System may be used only for Payments eligible under the RTP Operating Rules. At any time, the Bank may suspend or terminate the Customer's ability to send or receive RTP Payments as a Service in accordance with the Relationship Documents. The terms of this Clause 8 do not apply to customers that are financial institutions, other than domestic depository institutions, to which only the terms relating to the receipt of RTP Payments apply. The terms "**Sender,**" "**Receiver,**" "**Sending Participant**" (the sending financial institution), and "**Receiving Participant**" (the receiving financial institution), "**Person,**" "**RTP System,**" "**Payment,**" "**RTP Payment,**" "**Payment Instruction,**" "**Request for Payment**" and "**Request for Return of Funds**" are used in this Clause 8 as defined in the RTP Operating Rules.

Document Number: CC-01US-210511-EN. HSBC Group © All rights reserved.



**8.2     Disputes between Customer and Sender**

Any dispute between the Customer and a Sender must be resolved directly between such parties. The Bank has no responsibility for, and will not be liable to the Customer in connection with, any such dispute.

**8.3     Receiving RTP Payments**

RTP Payments are final and irrevocable and cannot be reversed by the Sender. However, a Sender may make a Request for Return of Funds sent through the RTP System.

**8.4     Rejecting RTP Payments**

The Customer may request upon seven (7) calendar days' advance written notice to the Bank that all RTP Payments destined to an Account be automatically rejected and returned to the originator of such RTP Payments, and the Bank will use reasonable efforts to promptly act upon such instructions. The Bank will have no liability for not effecting such a request within the seven (7) calendar-day notice period. If the Customer wishes to return a Payment received through the RTP System, the Customer should contact the Bank.

**8.5     Sending RTP Payments**

By submitting a Payment Instruction through the Bank's RTP Service, the Customer represents and warrants that such Payment Instruction complies with all Bank terms and conditions, that the Customer irrevocably and unconditionally authorizes the Bank to deduct the Payment Amount from the Customer's Account, and that the Bank may deduct this amount immediately upon receipt of the Customer's Payment Instruction.

The Customer may not send an RTP Payment from the Account through the Bank's RTP Service that exceeds the RTP Network limit published by The Clearing House for a single transaction. The Bank may establish a lower transaction limit for the Customer and may block any attempted RTP Payment that exceeds the limit. The Bank may adjust the Customer's limit at any time in its sole discretion and will notify the Customer in the event of any adjustments to the limits.

By submitting a Payment Instruction through the Bank's RTP Service, the Customer irrevocably and unconditionally authorizes the Bank to initiate an RTP Payment relying on the Receiver's routing transit and account number (or if the RTP network and Bank system allow, an alias) the Customer provides.

**8.6     Requests for Return of RTP Payments**

The RTP System allows a Sender to submit a Request for Return of Funds, but the Receiver is not obligated to comply. Where the Customer is the Sender submitting a Request for Return of Funds, the Bank cannot guarantee that the funds will be returned in whole or in part and will have no obligation to make any effort to recover such funds beyond the transmission of the Request for Return of Funds. A Sender may also request that the Customer returns funds the Customer received through the RTP System. If the Bank receives such a Request for Return of Funds, the Bank will attempt to contact the Customer, but will have no liability for failing to do so.

**8.7     Requests for Payment**

If enabled, the Customer may use the Bank's RTP Service to submit a Request for Payment, which will be considered a Payment Order in all respects under the terms of the Relationship Documents. The Customer acknowledges and agrees that the Bank does not guarantee that the Sender will send a payment in response to, or otherwise accept, the Customer's Request for Payment.

**9     Bill Payment Service**

**9.1     General Description of Service**

The Bill Payment Service provides the Customer with the ability to pay bills and to make payments to a business or other payee located in the US only. Under this Service, bill payments are sent by the Bank (or its agents) to payees by a check drawn off the Customer's selected Account. Such Account will be debited only when such check has been presented to and paid by the Bank.

**9.2     Prerequisites**

The Bill Payment Service requires all bill payments to be made from the Customer's demand deposit Account with the Bank. The Bill Payment Service may only be accessed via the Bank's on-line banking service, HSBCnet.

**9.3     Customer Obligations**

The Customer agrees not to use the Bill Payment Service to make any tax payment, any court ordered or directed payment, or any payment to a payee that has a mailing address outside the US. The Customer agrees that if such impermissible bill payments are attempted, the Bank and/or its agents will not be responsible therefor.

**9.4     Processing Schedule**

The Customer will provide to the Bank data, including the names, addresses, phone numbers and account information (or other information advised from time to time) of those payees to whom the Customer wishes to make a payment ("Bill Payment Instruction"). Bill payments scheduled before the applicable cut-off time on a Business Day will be processed on that day. Bill payments scheduled after the applicable cut-off time on a Business Day will be processed on the next Business Day.

The Customer will select a bill payment process date which is at least five (5) Business Days before the actual due date of the payment. The Customer agrees that the Bank is not responsible for any Bill Payment Instruction that is received or posted by the payee after the grace period, which could result in a late charge or penalty assessed to the Customer by the payee. In such event, the Customer agrees that it will have the sole risk of incurring, and the sole responsibility for paying, any and all such charges or penalties. If a Bill Payment Instruction cannot be processed according to the Customer's instructions, the Customer will receive a notification from the Bank via HSBCnet.

**9.5     Recurring Bill Payments**

The Customer may use the Bill Payment Service to authorize automatic recurring payments of recurring bills. These payments must be for the same amount each month and they will be paid on the same calendar day of each month or on the next Business Day if the regular payment day falls on a non-Business Day.

**9.6     Cancelling a Bill Payment**

If the bill payment is a recurring payment set up via the Bill Payment Service, then the Customer can cancel that bill payment through HSBCnet as long as the request is received before the bill payment process date of the next recurring bill payment.

Once a recurring bill payment is cancelled, all future bill payments to that payee will also be cancelled and the Customer must reschedule future bill payments to that payee.

**10     Incoming Bill Payment Service**

**10.1     General Description of Service**

The Incoming Bill Payment Service allows the Customer to

Document Number: CC-01US-210511-EN. HSBC Group © All rights reserved.



receive USD payments, credits or debits (for the purposes of this Clause 10, **"Payments"**) via bill payment services used by the bill collection agents of the Customer or the Customer's customers (each, an **"Agent"** and collectively, **"Agents"**), who transmit Payments to the Bank through the MasterCard RPPS® network.

**10.2    Payment Reporting**

The Bank will provide Payments data to the Customer or the Customer's designated representative within one (1) Business Day after receipt by the Bank of such Payment from the Customer or an Agent.

**10.3    Payment Funding**

Incoming Payments will be credited by the Bank to the Customer's designated Account and available for use as early as 9 a.m. Eastern Time on the first (1st) Business Day following the date of transmission and no later than the second (2nd) Business Day following such date. The Customer is responsible for same-day funding adjustments and debits to the Account.

**10.4    Customer Responsibility for Posting Payments**

The Customer will use its best efforts to post Payments to its Account on the same Business Day the Bank provides the Payment data to the Customer, and in no event later than one (1) Business Day after such date. No late fee will be assessed to the Customer's Account for any Payments received within the grace period but not posted on the Business Day received from the Bank.

**10.5    Rejected Payments; Correcting Account Information**

The Customer agrees that no Payments may be rejected by the Customer unless the Account data for such Payments is incorrect, incomplete, or the Customer Account is blocked or closed, and in such circumstances, the Customer will notify the MasterCard RPPS® Payment Center before any such Payment may be rejected. The Customer agrees to give to the Bank its mathematical algorithms and account edits, if any, for validating Account numbers. The Bank agrees that it will apply to the Payment data, any such algorithm given to the Bank by the Customer or an Agent, to validate such Account numbers.

## 11    Mobile Remote Deposit Capture Service

**11.1    General Description of Service**

The Mobile Remote Deposit Capture (**"mRDC"**) Service enables the Customer to deposit into one (1) or more Bank-designated and approved Accounts (each, an **"mRDC Account"** and each such deposit, an **"mRDC Deposit"**) money orders payable to the Customer in USD and checks payable to the Customer that are drawn on banks located in the US and denominated in USD (each an **"mRDC Check"**) using the HSBCnet Mobile App (**"Mobile App"**) with a compatible mobile device (a **"Mobile Device"**). An mRDC Check is considered an **"Instruction"** under the Relationship Documents.

**11.2    Representations, Warranties and Covenants**

The Customer represents, warrants, covenants and agrees in favor of the Bank as follows:

(i)    Each mRDC Check deposited pursuant to this Service is denominated in USD and is an original, not an image replacement document or substitute check, as applicable, and is drawn on a bank located in the US.

(ii)    The Customer has the right to exclusive possession, actually possesses, and has the right to receive full payment on, each original check at the time of the mRDC Deposit.

(iii)    No mRDC Check is subject to any claims and the Customer will not subsequently relinquish possession of or control

over, or otherwise treat, any original check, in a manner that (a) is inconsistent with its exclusive right of possession thereto; or (b) allows for any original check to be transferred, collected and/or paid or entered into any bank collection channels outside of this Service.

(iv)    The Customer has properly reviewed each mRDC Check and it accurately and legibly represents all printed, manuscript and other information on the front and the back of the related original check, and the image of the mRDC Check is clearly visible and legible.

(v)    Unless an mRDC Check is rejected as ineligible for this Service, the Customer will not present or deposit the check again.

(vi)    The Customer will not use this Service to deposit, collect or obtain payment on any check other than an mRDC Check payable to the Customer: (a) as the original payee thereof; and (b) for a sale and/or service in the ordinary course of its business.

(vii)    The Customer will use this Service solely as contemplated hereby and will not alter or otherwise modify the mRDC Service.

**11.3    Limitations**

The Bank may, in its sole discretion, establish limits on the Customer's use of this Service, including check amount, daily deposit amount, daily check volume and geographical location. It is the Customer's sole responsibility to stay within these limits. The Customer agrees that the Bank is not liable for any damages to the Customer or any third party resulting from any limitations with this Service.

**11.4    Acceptance of Receipt; Availability of mRDC Deposits**

The Bank will promptly acknowledge to the Customer its receipt of an mRDC Deposit. Such acknowledgement will not be deemed a receipt for final value or credit to any mRDC Account, or other account of or benefit to the Customer, other than as expressly provided in the Relationship Documents. The Customer hereby agrees that such acknowledgement will grant and transfer to the Bank, all of the right, title and interest in the mRDC Checks contained in the accepted mRDC Deposit which the Bank would acquire in the related original checks if such original checks were presented for deposit directly at a Bank branch located in New York, New York. Such funds will be available in accordance with the funds availability schedule of the Bank (refer to the US Special Funds Availability Table for more information).

**11.5    Verification and Discrepancies**

The Bank will notify the Customer of any failure, discrepancy or other problem, including as to the stated or actual amount, with respect to any mRDC Deposit (each a **"Discrepancy"** or a **"Discrepant Item"**) within a reasonable period of time after the date that Bank discovers such Discrepancy. Each affected mRDC Check will thereafter be deemed rejected and ineligible for this Service, unless the Bank otherwise agrees in writing.

**11.6    Availability of mRDC Deposits**

Upon acceptance of an mRDC Deposit (other than an mRDC Deposit subject to a Discrepancy), the Bank will credit to the ledger balance of the designated mRDC Account specified by the Customer in the transmission of such mRDC Deposit, an amount equal to the total amount of such deposit not later than the close of business on: (i) the Business Day such mRDC Deposit is accepted, if such mRDC Deposit is received at or prior to the applicable cut-off time on such Business Day, or (ii) the immediately following Business Day in all other cases.

Funds deposited may not be available for immediate withdrawal

Document Number: CC-01US-210511-EN. HSBC Group © All rights reserved.



and will be available as if original checks were presented for deposit directly at a Bank branch in New York, New York and in accordance with the funds availability schedule of the Bank (refer to the US Special Funds Availability Table for more information).

**11.7     Adjustments and Chargebacks**

An amount credited to any mRDC Account, though available for withdrawal or use by the Customer, will nonetheless be subject to adjustment and chargeback, as appropriate. The Bank will be entitled to charge back against the mRDC Account an amount equal to the amount of any mRDC Check credited to such mRDC Account, which is subsequently returned unpaid or is otherwise uncollected, regardless of the reason, plus associated third-party expenses and charges. In addition to the foregoing and notwithstanding any provision hereof, the Bank will be entitled to make adjustments to any mRDC Account for any clerical or other error in accordance with its usual and customary practices. Information regarding any such chargeback or adjustment to an mRDC Account will be available to the Customer via HSBCnet within two (2) Business Days thereof.

**11.8     Retention, Safekeeping and Limitation on Use of Original Checks**

The Customer will retain original checks for sixty (60) days following the mRDC Deposit date and will not attempt to deposit, sell, license or endorse any check or any information therein to anyone else. Upon the Bank's request, the Customer will promptly deliver to the Bank any original checks which the Customer is at such time required to retain or which the Customer then possesses or has in its control. If the Customer chooses not to follow the foregoing sixty (60) day retention requirement, the Customer will indemnify the Bank for any Losses resulting therefrom.

**11.9     Intellectual Property**

"mRDC IP" means any and all intellectual property and proprietary rights relating to the mRDC Service, including trademarks, trade names, service marks, trade secrets, moral rights, registrations and applications, renewals, extensions, restorations and reinstatements of each of the foregoing and derivatives of each of the foregoing. The Customer acknowledges that as between the parties, the Bank will retain all pre-existing ownership and other rights in the mRDC IP. The Bank hereby grants to the Customer a limited, non-exclusive, non-transferable right to the mRDC IP solely to use the mRDC Service in accordance with the Relationship Documents and for no other purpose.

The Customer will not, and will  not permit any other person to: (i) copy, modify, create derivative works, or transfer the mRDC IP (or any copy, adaptation, transcription, or merged portion thereof); (ii) reverse engineer, reverse-compile or reverse-assemble the mRDC IP or otherwise obtain the source code for the mRDC IP; (iii) knowingly develop any other products containing the concepts or ideas contained in any proprietary information that are not readily apparent from the authorized use of the mRDC IP; (iv) use the mRDC IP for payment processing on a time sharing, rental or service bureau basis; or (v) remove any patent, copyright, trademark or other intellectual property notice relating to any person, which may appear on any part of the mRDC IP, without prior written approval of the Bank.

The Customer will notify the Bank within a reasonable amount of time regarding any known unauthorized use or disclosure of the mRDC IP and/or any known problems or errors related thereto, reasonably cooperate with the Bank to meet any of its

obligations to any licensors of the mRDC IP and comply with Law relating to the mRDC IP. The Customer acknowledges and agrees that nothing herein will, or will be construed to, grant the Customer any rights to the mRDC IP, whether registered or unregistered. The Customer will not, and will not cause, assist, or encourage any third party to: (i) do anything inconsistent with the Bank's or its licensor's ownership or other rights in and to the mRDC IP; (ii) challenge the Bank's or its licensor's ownership or right to license the mRDC IP; or (iii) knowingly harm or misuse the mRDC IP in any way.

Upon termination of the Service, the mRDC IP license will be deemed to be immediately and automatically revoked and the Customer will immediately discontinue use of all mRDC IP.

**11.10     Bank Inspection Rights**

The Customer will grant the Bank reasonable access to the Customer's mRDC Service operations and records to review and inspect the Customer's use of, and procedures and records relating to, this Service. The Customer agrees that where applicable, the Bank may require the Customer to implement additional specific internal controls at the Customer's location.

**11.11     Limitation of Liability**

In addition to any other rights under the Relationship Documents, the Bank is not liable for any direct or remote loss to the Customer due to the Customer's inability to use this Service for any reason, including: (i) a Mobile Device being located outside the authorized geographical area; (ii) a user's failure to provide consent to allow its Mobile Device to be located; or (iii) failure of this Service to connect to a customer's Mobile Device for any other reason.

**11.12     Equitable Remedies**

The Customer acknowledges and agrees that due to the nature of the Bank's and/or its licensors' ownership and other rights in and to the mRDC IP, there may be no adequate remedy at Law for a breach by the Customer with respect to the mRDC IP, which may result in irreparable harm to Bank or its licensors, and therefore, upon any such breach or threat thereof, the Bank will be entitled to seek injunctive relief, as well as whatever remedies it may have at Law or in equity, without the requirement to post any bond or security.

**11.13     Modification**

The Customer may add, delete or change an mRDC Account on at least ten (10) Business Days' prior written notice to the Bank, subject to acceptance by the Bank, and will provide any additional documentation, if requested by the Bank.

**11.14     Term and Termination**

The Customer may terminate this Service for any reason upon thirty (30) days' prior written notice to the Bank. The Bank may terminate this Service at any time for any reason.

Document Number: CC-01US-210511-EN. HSBC Group © All rights reserved.



# US Special Funds Availability Table

The following is the US Funds Availability Table which supplements and forms part of the Relationship Documents, which apply to the provision of Accounts and Services by the Bank to the Customer in the US.

Funds from deposits into interest-bearing and noninterest-bearing checking Accounts are made available according to where the check is drawn, where the deposit is made, and the type of Account, pursuant to the following schedule.

To use this document and determine funds availability, first locate the check routing number. The routing number is printed along the bottom of the check. The first four (4) digits represent the geographic location of the Bank and determine when funds become available. Some checks are marked "payable through" and have a four (4) or a nine (9) digit number next to these words. For these checks, use the four (4) digit number (or the first four (4) digits of the nine (9) digit number), not the routing number on the bottom of the check, to determine funds availability.

## 1   Interest-bearing checking accounts

### 1.1   Deposits made in California

At least 93% of funds from check deposits with routing numbers starting 1210 1211 1212 1213 1214 1220 1221 1222 1223 1224 3210 3211 3212 3213 3214 3220 3221 3222 3223 or 3224 are made available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (unless qualifying for next day availability) are made available by the second (2nd) Business Day after the day of deposit.

### 1.2   Deposits made in downstate New York, Connecticut, Delaware, New Jersey, and Pennsylvania

At least 93% of funds from check deposits with routing numbers starting 0110 0111 0112 0113 0114 0115 0116 0117 0118 0119 0210 0211 0212 0213 0214 0219 0220 0223 0260 0280 0310 0311 0312 0313 0319 0360 0410 0412 0420 0430 0432 0433 0434 0440 0510 0514 0519 0520 0521 0522 0530 0531 0539 0540 0550 0560 0570 0610 0620 0630 0640 0650 0660 0710 0720 0730 0740 0750 0810 0820 0830 0840 0910 0920 0921 0960 1010 1020 1030 1039 1040 1110 1130 1140 1210 1220 1230 1240 1250 2110 2111 2112 2113 2114 2115 2116 2117 2118 2119 2210 2211 2212 2213 2214 2219 2220 2223 2260 2280 2310 2311 2312 2313 2319 2360 2410 2412 2420 2430 2432 2433 2434 2440 2510 2514 2519 2520 2521 2522 2530 2531 2539 2540 2550 2560 2570 2610 2620 2630 2640 2650 2660 2710 2720 2730 2740 2750 2810 2820 2830 2840 2910 2920 2921 2960 3010 3020 3030 3039 3040 3110 3130 3140 3210 3220 3230 3240 or 3250 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (unless qualifying for next day availability) are made available by the second (2nd) Business Day after the day of deposit.

### 1.3   Deposits made in upstate New York

At least 93% of funds from check deposits with routing numbers starting 0110 0111 0112 0113 0114 0115 0116 0117 0118 0119 0210 0211 0212 0213 0214 0219 0220 0223 0260 0280 0310 0311 0312 0313 0319 0360 0410 0412 0420 0430 0432 0433 0434 0440 0510 0514 0519 0520 0521 0522 0530 0531 0539 0540 0550 0560 0570 0610 0620 0630 0640 0650 0660 0710 0720 0730 0740 0750 0810 0820 0830 0840 0910 0960 1010 1020 1030 1039 1040 1110 1130 1140 1210 1220 1230 1240 1250 2110 2111 2112 2113 2114 2115 2116 2117 2118 2119 2211 2212 2213 2214 2219 2220 2223 2260 2280 2310 2311 2312 2313 2319 2360 2410 2412 2420 2430 2432 2434 2440 2510 2514 2519 2520 2521 2522 2530 2531 2539 2540 2550 2560 2570 2610 2620 2630 2640 2650 2660 2710 2720 2730 2740 2750 2810 2820 2830 2840 2910 2960 3010 3020 3030 3039 3040 3110 3130 3140 3210 3220 3230 3240 or 3250 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) are available by the second (2nd) Business Day after the day of

deposit.

### 1.4   Deposits made in the District of Columbia, Maryland and Virginia

At least 93% of funds from check deposits with routing numbers starting 0110 0111 0112 0113 0114 0115 0116 0117 0118 0119 0210 0211 0212 0213 0214 0219 0220 0223 0260 0280 0310 0311 0312 0313 0319 0360 0410 0412 0420 0430 0432 0433 0434 0440 0510 0514 0519 0520 0521 0522 0530 0531 0539 0540 0550 0560 0570 0610 0611 0612 0613 0620 0630 0640 0650 0660 0710 0711 0712 0719 0720 0730 0740 0750 0810 0820 0830 0840 0910 0920 0921 0960 1010 1020 1030 1039 1040 1110 1120 1130 1140 1210 1220 1230 1240 1250 2110 2111 2112 2113 2114 2115 2116 2117 2118 2119 2220 2223 2260 2280 2310 2311 2312 2313 2319 2360 2410 2412 2420 2430 2432 2433 2434 2440 2510 2519 2520 2521 2522 2530 2531 2539 2540 2550 2560 2570 2610 2611 2612 2613 2620 2630 2640 2650 2660 2710 2711 2712 2719 2720 2730 2740 2750 2810 2820 2830 2840 2910 2920 2921 2960 3010 3020 3030 3039 3040 3110 3130 3140 3210 3220 3230 3240 or 3250 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) are made available by the second (2nd) Business Day of the deposit.

### 1.5   Deposits made in Florida

At least 93% of funds from check deposits with routing numbers starting 0110 0210 0212 0220 0260 0280 0310 0360 0410 0420 0430 0440 0510 0519 0520 0530 0539 0610 0620 0630 0631 0632 0640 0650 0660 0670 0710 0720 0730 0740 0750 0810 0820 0830 0840 0910 0920 0921 0960 1010 1020 1030 1039 1040 1110 1130 1140 1210 1220 1230 1240 1250 2110 2210 2212 2220 2260 2280 2310 2360 2410 2420 2430 2440 2510 2519 2520 2530 2539 2610 2620 2630 2631 2632 2640 2650 2660 2670 2710 2720 2730 2740 2750 2810 2820 2830 2840 2910 2920 2921 2960 3010 3020 3030 3039 3040 3110 3130 3140 3210 3220 3230 3240 or 3250 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day after the day of deposit.

### 1.6   Deposits made in Oregon, Washington State

At least 93% of funds from check deposits with routing numbers starting 1230 1231 1232 1233 1250 1251 1252 3230 3231 3232 3233 3250 3251 or 3252 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day after the day of deposit.

## 2   Noninterest-bearing checking accounts

### 2.1   Deposits made in California

At least 93% of funds from check deposits with routing numbers starting 1210 1211 1212 1213 1214 1220 1221 1222 1223 1224 3210 3211 3212 3213 3214 3220 3221 3222 3223 or 3224 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day after the day of deposit.

### 2.2   Deposits made in downstate New York, New Jersey, Connecticut, Delaware and Pennsylvania

At least 93% of funds from check deposits with routing numbers starting 0210 0212 0214 0219 0260 0280 2210 2212 2214 2219 2260 or 2280 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day

Document Number: CF-03US-210405-EN. HSBC Group © All rights reserved.



after the day of deposit.

**2.3    Deposits made in upstate New York**

At least 93% of funds from check deposits with routing numbers starting 0213 0220 0223 0410 2213 2220 2223 or 2410 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day after the day of deposit.

**2.4    Deposits made in the District of Columbia, Maryland, Virginia and Florida**

Funds from check deposits drawn on all routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day after the day of deposit.

**2.5    Deposits made in Washington State**

At least 93% of funds from check deposits with routing numbers starting 1230 1231 1232 1233 1250 1251 1252 3230 3231 3232 3233 3250 3251 or 3252 will be available by the next Business Day after the day of deposit. All funds from check deposits drawn on other routing numbers (except those qualifying for next day availability) will be available by the second (2nd) Business Day after the day of deposit.

[1]Downstate New York includes the boroughs of New York, Long Island and Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster and Westchester Counties.

Document Number: CF-03US-210405-EN. HSBC Group © All rights reserved.



The following disclosures ("United States Account Disclosures") supplement the Master Services Agreement ("MSA") and form part of the Relationship Documents which will apply to the provision of Services by the Bank to the Customer in the United States. This is a Supporting Document and should be read together with the United States Country Conditions and all other Relationship Documents.

## 1   FDIC Insurance

1.1   All funds in transaction Accounts are insured by the Federal Deposit Insurance Corporation ("FDIC") up to the standard maximum deposit insurance amount for each deposit insurance ownership category.

1.2   The Customer may transfer or elect to have the Bank automatically sweep funds from its Account: (i) into another deposit product; or (ii) into an uninsured non-deposit product or for use in an uninsured non-deposit service. The Customer's transfers and/or election to have funds automatically swept from its Account can affect the FDIC insured status of the funds.

The products the Bank offers that involve transfers and/or automatic sweeping of funds from the Account into another FDIC-insured deposit Account include transfers and sweeps related to Zero Balance Account ("ZBA")/cash concentration services, subaccounts, money market deposit Accounts, and Accounts set up in connection with the Bank's Overnight Interest Sweep ("OIS") Service. Transfers or automatic sweeping of funds from the Account into another FDIC-insured deposit Account does not change the insured status of the transferred or swept funds.

The products the Bank offers that involve transfers or automatic sweeping of funds from the Account into uninsured non-deposit services include automated sweeps to money market mutual funds, the Bank's overnight International Banking Facility ("IBF"), and accounts at other banks. Transferring and/or sweeping funds from the Account into an uninsured non-deposit Account or for use in an uninsured non-deposit service will cause swept funds to lose their FDIC-insured status.

1.3   Funds transferred and/or swept from the Account into: (i) a money market mutual fund; (ii) an IBF; (iii) an account at a bank or financial institution whose deposits are not FDIC-insured (including banks outside the US); or (iv) any other uninsured Account or financial product, will result in the loss of FDIC-insured status for the transferred or swept funds. In the event of the Bank's failure: (i) any investment in a money market mutual fund will continue as an interest in the applicable investment and the Customer will not have a depositor's or general creditor's claim against the Bank; (ii) the Customer will be treated as a general, unsecured creditor with respect to any funds automatically swept from the Account into an IBF, or transferred or swept to any of the Bank's other uninsured accounts or financial products; and (iii) the Customer will be treated as a depositor of the other bank or financial institution with respect to any funds which have been transferred or automatically swept from the Account into an account at such other bank or financial institution.

## 2   Funds Availability

2.1   Unless specifically stated otherwise herein, the disclosures made in this Clause 2 apply to all checking and savings Accounts and to certificates of deposit provided by the Bank. Until funds are available according to this Clause and the United States Special Funds Availability Table, the Customer may not withdraw the funds in cash, and the Bank may choose not to use the funds to pay checks the Customer has written or other withdrawals or transfers the Customer has authorized.

The day of availability of funds is counted in Business Days from the day of the Customer's deposit of such funds with the Bank. If the Customer makes a deposit at a branch on a Business Day, the Bank will consider that day to be the day of the Customer's deposit. If the Customer makes a deposit before 10 p.m. Eastern Time at any HSBC ATM or via Mobile Remote Deposit Capture ("mRDC"), Remote Deposit Capture ("RDC") or Image Cash Letter ("ICL") on a Business Day, the Bank will consider that day to be the day of the Customer's deposit. However, if the Customer makes a deposit at 10 p.m. Eastern Time at an HSBC ATM or via mRDC, RDC or ICL on a Business Day or the Customer makes said deposit on a non-Business Day, the Bank will consider that deposit to be made on the next Business Day.

The day of availability varies depending on the type of deposit, as explained below:

(i)   <u>Same Day Availability</u>: Cash deposits, funds transfers between Accounts in the same name, and RTP payments are available on the same day the Bank receives the deposit. For deposits that are eligible for same day availability, if the Bank receives a deposit after 12 a.m. (Midnight) Eastern Time, the deposit will be considered received the next day. Incoming wire transfers and electronic direct deposits are made available on the same Business Day the Bank receives the deposit or the final credit for the deposit.

(ii)   <u>Next Day Availability</u>: Funds from the following deposits made payable to the Customer are available to the Customer on the first (1st) Business Day after the day of the Customer's deposit:

- US Treasury Checks

- Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders

- Checks drawn on the Bank

Funds from the following deposits payable to the Customer are made available on the first (1st) Business Day after the day of deposit if made in person to one of the Bank's employees using a special deposit slip available on request at any branch:

- State and local government checks

- Cashier's, certified, and teller's checks

Deposits of funds from state and local government, cashier's, certified, or teller's checks, and cash not made in person to one of the Bank's employees (for example, deposit via mail), will be available on the second (2nd) Business Day after the day of the Customer's deposit.

Check deposits other than those identified above are considered "Other Check Deposits." At least the first $225 of the Customer's Other Check Deposits will be made available on the first (1st) Business Day after the day of the Customer's deposit. The remaining balance of the Customer's Other Check Deposits will be available in accordance with the United States Special Funds Availability Table, based on Account type and Account location.

In some cases, funds the Customer deposits by check may be unavailable for a longer period including where: (i) the Bank believes a deposited item will not be paid; (ii) the Account has been repeatedly overdrawn in the last six (6) months; (iii) the Customer redeposits a check that has been returned unpaid; (iv) the Customer deposits checks totaling more than $5,525 on any one day; or (v) the Bank has an emergency, including, a system, computer or communications failure. The Bank will notify the Customer of any such delays and when the funds will be available.  Generally, this will be by the sixth (6th) Business Day after the day of the Customer's deposit.

Document Number: CF-01US-210405-EN. HSBC Group © All rights reserved.



(iii) If the Bank accepts for deposit a check that is drawn on another bank, it may make the funds available for withdrawal immediately, but delay the Customer's ability to withdraw a corresponding amount that it has on deposit in another Account. The funds in such other Account would not be available for withdrawal until the scheduled availability day for the type of check deposited. When the Bank cashes a check drawn on another bank, the Bank may withhold the availability of a corresponding amount of funds in the Account. The funds will become available when funds from the check cashed would have been available had the Customer deposited it.

The Bank may refuse to accept or delay the availability of checks drawn on banks outside the United States (including HSBC affiliates) and on checks drawn in foreign currencies, convert such checks to USD and deposit them as cash or handle them on a collection basis. Regardless of whether the Customer's foreign check is converted or processed on a collection basis, the Customer will bear all exchange risk in the event of a returned item. If the Customer wants to avoid such exchange risk, it can request that the item be processed on a collection basis for the applicable fee. If a check drawn on a bank outside the United States uses a dollar sign ("$") but does not indicate that the check is drawn in USD, the Bank will process it as a check drawn in the currency of the country where the bank is located, e.g. Canada. The Customer will bear the costs associated with any adjustments that must be made if the check should have indicated it was drawn in USD, including exchange rate adjustments and fees assessed against the Bank by third parties related to the adjustment. The Customer can avoid this risk by making sure that the issuer of the item clearly identifies checks payable in USD.

2.2 The Bank may apply the following rules during the first thirty (30) days the Account is open:

Funds from deposits of cashier's, certified and teller's checks, and federal, state and local government checks will be available on the first (1st) Business Day after the day of the Customer's deposit if the deposit meets certain conditions. For example, checks must be payable to the Customer and deposited in person to an employee of the Bank (and the Customer may have to use a special deposit slip). If the Customer's deposit does not meet these conditions, funds from the Customer's deposit will be available to the Customer no later than the fifth (5th) Business Day after the day of deposit. Funds from Other Check Deposits will be available to the Customer no later than the fifth (5th) Business Day after the day of the Customer's deposit.

2.3 The Bank's funds availability policy does not affect the Customer's obligation to repay the Bank for checks that the Customer deposits which are returned unpaid, nor does it limit the Bank's right to charge back the Account or to obtain reimbursement for any check that is not finally paid for any reason.

## 3    Checking and Savings Accounts

3.1 Checking Accounts maintained on the Bank's demand deposit account ("**DDA**") system may consist of two (2) sub-accounts on the Bank's books: a checking sub-account and a savings sub-account. These sub-accounts will be treated as a single Account for the Customer's use and the Customer's bank statement, Account balance, interest, fees, or features of the Account. For interest-bearing checking Accounts, the Bank pays the same interest rate on balances in both sub-accounts. All deposits and other credits will be posted to, and checks and debits deducted from, the checking sub-account.

If the checking sub-account exceeds a threshold amount (which the Bank may establish and change at its discretion), the Bank may transfer excess funds to the savings sub-account. As such funds are needed to pay items presented against the Customer's checking sub-account, the Bank will transfer the equivalent amount back to the checking sub-account up to six (6) times per statement period. If a sixth (6th) transfer is needed, the balance of the savings sub-account will be transferred to the checking sub-account. This process may be repeated each month. The above description does not apply for checking accounts maintained on the Bank's Wholesale Deposit Account ("**WDA**") system.

3.2 The Bank has no duty to visually inspect signatures on checks. The Bank may, at its discretion, return unpaid checks or drafts where the signature does not correspond to the signature of record, unless the Customer notifies the Bank in advance in written form acceptable to the Bank at its sole discretion that it authorizes such checks or drafts to be paid. The Bank may construe the meaning as "or" of any symbol, mark or word (other than the word "and") used as a connective, or may imply that the word "or" was meant to be inserted in the absence of any connective, on the payee line of any check containing multiple payees. In addition, the Bank may debit the Customer's checking and savings Accounts based on a single signature regardless of the transaction amount, and any multiple-signature requirements or signing limits, or restrictions that the Customer may have shared with the Bank are for the Customer's internal use only, notwithstanding any communication or instruction to the Bank to the contrary.

3.3 The Bank may debit the Account the day an item is presented or at such earlier time as the Bank receives notification that an item drawn on the Account has been deposited at another financial institution.

For transaction accounts opened and maintained on the Bank's WDA system, the Bank will pay debit items upon presentation and in no particular size order.

For all other Accounts, the Bank posts transactions to the Account throughout the day in the order that it receives them. At the end of each Business Day, the Bank completes the following to determine the Customer's end of day bank/ledger balance:

1. Start with the bank/ledger balance in the Account;

2. Add deposits and credits to the Account;

3. Subtract fees resulting from prior day activities which were not charged on the current day (e.g., Chargeback Fee);

4. Subtract outgoing wire transfers;

5. Subtract from available balance account withdrawals performed at the branch from lowest to highest dollar amount;

6. Subtract from available balance transaction amounts that are authorized based on the Customer's available balance at the time it performed the transaction in lowest to highest dollar amount. Transactions include everyday debit card transactions, ATM withdrawals, and online transactions (Note: The amount authorized for debit card transactions might vary from the actual amount of the transaction that posts to the Account at settlement);

7. Subtract all other items in a lowest to highest dollar amount; and

8. Subtract fees resulting from current day activities (e.g., Stop Payment Fee).

Document Number: CF-01US-210405-EN. HSBC Group © All rights reserved.



After completing the steps above to determine the Customer's end of day bank/ledger balance, the Bank subtracts the amount of any deposit not currently available (refer to the United States Special Funds Availability Table for more information) and subtracts holds (e.g., debit card authorizations) from the end of day bank/ledger balance to determine the Customer's available balance, and whether or not an overdraft fee is assessed.

An overdraft occurs when the Customer does not have enough money (available balance) in the Account to cover a transaction, but the Bank pays it anyway. The Customer's available balance is the amount of funds the Customer has available in the Account to spend without overdrawing the Account. It includes all cleared and pending transactions (e.g. holds for debit card transactions that the Customer has authorized that have not been presented to the Bank for payment). The Customer should keep in mind that any non-preauthorized transactions (e.g. checks) the Customer initiated but which have not yet been presented to the Bank for payment need to be subtracted from the Customer's available balance for the Customer to know the exact amount of money the Customer has to spend or withdraw. Balances may change frequently throughout a Business Day. The Customer waives any claim against the Bank based on representations made by the Bank, either orally or in writing to the Customer, or its authorized persons, or to any other party, regarding balance information.  The available balance does not include the amount of deposits not currently available (refer to Clause 2 for more information).

The Bank may cover the Customer's overdrafts through the Bank's standard overdraft practices or through a MASTERCARD BUSINESSCARD® agreement. Through the Bank's standard overdraft practices, the Bank may, at its discretion, authorize and pay overdrafts for checks and overdrafts for preauthorized automatic bill payments. Under the Bank's standard overdraft practices, the Bank will charge the Customer the associated Insufficient Funds ("NSF") or Unavailable Funds ("UNA") fees listed on the Bank's Terms and Charges (as defined in the United States Country Conditions). The Bank permits overdrafts at its discretion, which means the Bank does not guarantee that it will always authorize and pay any type of transaction for any type of Account. Any resulting negative balance regardless of cause must be repaid promptly. If the Bank does not authorize and permit an overdraft, the Customer's transaction will be declined.

If the Customer has a qualifying Account, the Customer can use the available balance on its qualifying MASTERCARD BUSINESSCARD credit account with the Bank to fund any overdraft amount automatically. The MASTERCARD BUSINESSCARD is subject to application and credit approval. The Account may be debited on the day an item is presented, or at such earlier time as notification is received by the Bank that an item drawn on the Account has been deposited for collection in another financial institution. A withdrawal is deemed to be made when recorded on the books of the Bank, which is not necessarily the date that the account holder initiated the transaction.  The Bank reserves the right to pay each item into overdraft, to impose overdraft fees as permitted by Law, and to apply any later deposits to those overdrafts or overdraft fees, by way of setoff. An "**item**" includes Instructions, Payment Orders, Remotely Created Checks (as defined below), service charges, and any other instruments for the payment, transfer or withdrawal of funds including an image or photocopy of same, and any resubmission thereof due to insufficient or unavailable funds. A determination of the Account balance for purposes of making a decision to dishonor an item for insufficiency of available funds may be made at any time between the receipt of such presentment or notice and the time of return of the item, and no more than one such determination need be made.

MASTERCARD BUSINESSCARD is a registered trademark or service mark of Mastercard or its subsidiaries in the United States

If any check or other item deposited into the Account does not have the Customer's endorsement, the Bank has the right to endorse such item or treat it as if the Customer had endorsed it. Any check or other item deposited into the Account that appears to contain the Customer's stamped or facsimile endorsement will be treated as if the Customer had actually endorsed it. The Bank is not legally bound by any conditional or restrictive endorsement on any check or other item that the Customer cashes or deposits, or any endorsement noted to be "without recourse". The Customer is responsible for any Loss resulting from its improper endorsement of a check if it causes a Bank endorsement to be illegible. The Bank may require that checks and other items the Customer wishes to deposit be endorsed by all parties to whom the items are payable. The Bank may require verification of any endorsement through either an endorsement guarantee or personal identification. If the Customer deposits items which bear the endorsement of more than one (1) person or of persons who are not signers on the Account, the Bank may refuse the item or may require the Customer to have its endorsement guaranteed before the Bank accepts an item. The Bank may accept for deposit checks payable to any signer on the Account when endorsed by any other authorized signer.

3.4   The Customer may request the Bank to stop payment on a check drawn on the Account in person, by mail, by phone or by using the Bank's internet banking systems. The Bank needs a reasonable amount of time to apply the stop-payment request and to verify that the check has not already been paid. The Customer must provide the Bank with the Account number, payee, date, exact amount of the check and the check number. The Customer's stop payment request takes effect when the Bank records it on the Account. Telephone requests must be confirmed in writing within fourteen (14) days. Stop payment requests will only be valid for six (6) months, unless renewed in writing. Special procedures apply to a cancellation of a funds transfer.

3.5   A "**Remotely Created Payment Order**" is any payment instruction or order drawn on a person's deposit Account that is created by the payee or the payee's agent and deposited into or cleared through the check clearing system. This includes a "Remotely Created Check," as defined in Regulation CC (12 CFR Part 229). The Bank may refuse to receive or process for deposit or collection any Remotely Created Check or another Remotely Created Payment Order, without cause or prior notice. If the Customer deposits a Remotely Created Check or another Remotely Created Payment Order into the Account, the Customer represents, warrants and agrees to the following for each such item: (i) the Customer is not a Telemarketer or engaged in Telemarketing, as those terms are defined in the Federal Trade Commission Telemarketing Sales Rule (16 CFR Part 310) ("TSR"); (ii) the Customer has received duly lawful, express and verifiable authorization to create a Remotely Created Check or another Remotely Created Payment Order in the amount and to the payee that appears on such item; (iii) the Customer has and will maintain proof of the necessary authorization for at least two (2) years from the date of the authorization and supply the Bank with evidence of such authorization upon request within five (5) Business Days; (iv) the Customer is identifying and will continue to identify any Remotely Created Checks and other Remotely Created  Payment Orders the Customer presents for deposit or collection by entering a "6" in the External Processing Code field of the MICR line in conformance with current X9 Standards and will hold the Bank harmless from any Losses in the event the Customer fails to do so; (v) if a Remotely Created Check or another Remotely Created Payment Order is returned, the Customer owes the Bank the amount of such item, regardless of when it is returned, and agrees to hold the Bank harmless from any Losses arising from

Document Number: CF-01US-210405-EN. HSBC Group © All rights reserved.



this deficiency; (vi) the Bank may take funds from the Account to pay the amount the Customer owes, and if there are insufficient funds in the Account, the Customer owes the Bank the remaining balance; (vii) the Customer is operating and will continue to operate in accordance with Law applicable to Remotely Created Checks and other Remotely Created Payment Orders, including Regulation CC, the New York Uniform Commercial Code, and TSR; and (viii) the Bank has the right at any time to review the activity in the Account and set limits on allowable unauthorized returns.

3.6    If the Customer or their authorized third party creates a Remotely Created Check or a check that otherwise bears a facsimile signature, the Bank may at its discretion, but is not required to, pay such check.  Alternatively, the Bank may return such check even if the Bank has honored similar checks in the past. The Customer agrees that the Bank is not liable to the Customer for any Losses that may result from either honoring or dishonoring any such checks.

3.7    The Bank may certify or pay a check before the date written on it and charge the Account without being liable. The Bank may also refuse to certify or pay a post-dated check. The Bank may dishonor and return unpaid other items drawn, accepted or made by the Customer as a consequence of the Bank having certified or paid a post-dated item.

3.8    The Bank is not required to pay an uncertified check six (6) months after the date written on it. The Bank will not be liable in the event the Bank does pay such check.

3.9    The Bank may replace original checks with "substitute checks". Such checks constitute a slightly-reduced image of the front and back of the original and will state: "This is a legal copy of the Customer's check." The Customer can use such checks in the same way it would use original checks. The Customer may use a substitute check as proof of payment. Some or all checks the Customer receives back from the Bank may be substitute checks.

3.10   The Bank may elect not to return physical checks to the Customer following processing. If the Customer needs a copy of a cancelled check or other item, the Bank will make it available to the Customer. The Bank will hold copies of the Customer's records for the period required by Law, which is generally seven (7) years.

3.11   The Bank may require the Customer to use the Bank's checks. Depending on style and number of checks the Customer orders and the kind of checking account the Customer has, the Bank may charge a fee to the Account for the Customer's checks. Should the Customer elect not to use the Bank's style or designed checks, the checks must meet the Bank's specifications and must comply with industry standards.

3.12   The Bank offers interest bearing checking Accounts and savings Accounts against which checks may be written. The Bank may ask the Customer for seven (7) days' advance notice of a withdrawal from a savings Account. If the Bank does so, it will not be liable for dishonoring the Customer's checks during the seven (7)-day notice period. Savings Accounts are not transferable except on the Bank's books.

3.13   Cash deposited before the cut-off time described below begins earning interest the same day. Cash deposited after such cut-off time or on a non-Business Day, begins earning interest the next Business Day.

    1. Branch cut-off time is when it closes.

    2. For ATMs that accept deposits, the cut-off time is 10 p.m. Eastern Time.

If applicable, the Bank credits interest to the Account monthly, quarterly, semi-annually, annually or at maturity, depending on Account type. Credited interest will show on the Customer's statement. Interest on savings Accounts and Certificates of Deposit ("CD") can be credited to another qualified HSBC checking or savings Account per the Customer's specifications. A CD does not earn interest after the maturity date. However, the Customer will earn interest from the original maturity date on the renewed principal amount if the Customer renews its CD within the Grace Period, as defined in the US Global Liquidity and Cash Management Terms and the renewal date adjusted to the original maturity date.

3.14   Only six (6) pre-authorized, automatic, computer or telephone transfers may be made from a savings Account to another Account in any calendar month. If permitted by the Account, checks, drafts, debit card transactions or similar orders made payable to a third party are included in this limit. If the Customer exceeds this limit, the Bank may be required to close or convert the Customer's savings Account to a checking Account.

3.15   **Recordcheck Service**

By choosing this Service that does not provide image copies of the front and back of cancelled items with the Customer's statement, the Customer has instructed the Bank to hold copies of the cancelled items in accordance with the applicable terms of service. If needed, the Bank will mail a copy of a cancelled check to the Customer. A reconstruction fee may apply if a total reconstruction (copies of all checks and/or statements) is requested by the Customer for one (1) or more statements. The Bank will hold check copies for six (6) years (seven (7) years for Accounts at our Washington State branches. Check copies are available during the foregoing period in accordance with the Terms and Charges.

3.16   **Image Statement Service**

By choosing this Service that provides image copies of the front and back of cancelled items with the Customer's statement, the Customer has instructed the Bank to hold copies of the cancelled items in accordance with the applicable terms of service. If needed, the Bank will mail a copy of a cancelled check to the Customer. A reconstruction fee may apply if a total reconstruction (copies of all checks and/or statements) is requested by the Customer for one (1) or more statements. The Bank will hold check copies for six (6) years (seven (7) years for Accounts at our Washington State branches. Check copies are available during the foregoing period in accordance with the Terms and Charges.

**4      Deposits**

4.1    The Bank will chargeback to the Account any item that is returned for any reason, including endorsement irregularity or forgery. The Bank will charge the Account the fee shown on its Terms and Charges. Multiple NSF / UNA Fees for items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to NSF or UNA in the Account, may be resubmitted one (1) or more times for payment. The Bank may charge the Account the NSF and/or UNA fee shown on its Terms and Charges EACH TIME an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds or unavailable funds.

4.2    The Bank verifies all deposits and may adjust the Account without notifying the Customer where there are discrepancies between its deposit tickets and the value deposited, unless otherwise agreed in writing. The Bank has no duty to honor and may disregard any information on a check, other than the paying bank's and payee's names, the amount (the Bank may rely solely upon either the numeric amount or the amount in words, if

Document Number: CF-01US-210405-EN. HSBC Group © All rights reserved.



contradictory) and any MICR encoded information.

4.3 The Bank chooses the method of obtaining final payment of a deposited check, note, acceptance or other instrument and may use other banks in the process. The Bank is not responsible for actions taken by other banks or for the loss or destruction of any item in the possession of other banks or in transit. Any bank may refuse to honor a deposited item or to honor one refused by another bank.

4.4 The Bank does not accept traveler's checks for deposit, payment or encashment. The Customer may deposit or cash domestic US postal money orders in person, or by mail from locations within the US The Bank reserves the right at its discretion to return (i) traveler's checks; and (ii) domestic US postal money orders mailed from locations outside the US and the Bank will not be liable for any Loss or delay in any such return.

4.5 For savings Accounts, the Bank posts transactions to the Account throughout the day in the order that the Bank receives them. At the end of each Business Day, the Bank will complete the following to determine the Customer's end of day bank/ ledger balance:

1. Start with the bank/ledger balance in the Account;
2. Add deposits and credits to the Account;
3. Subtract Account withdrawals performed at the branch and transaction amounts that were authorized based on the Customer's available balance at the time the Customer performed the transaction. Transactions will post in lowest to highest USD amount. Transactions include ATM withdrawals and online transactions;
4. Subtract all other items in lowest to highest USD amount; and
5. Subtract fees.

Note: The Customer should subtract holds from the end of day bank/ledger balance to determine its available balance. Refer to the United States Special Funds Availability Table for more information.

## 5   Other Terms

5.1 The Bank follows special procedures when an Account is inactive. An Account is inactive when there is no Customer-initiated activity and the Bank receives nothing in writing that indicates that the Customer knows the Account exists for at least one (1) year. An Account is dormant if it remains inactive for one (1) year. The Bank may attempt to contact the Customer to reactivate an Account before it becomes dormant, and prohibit access to dormant Accounts until contacted at a branch, by phone or in writing.  If an Account remains inactive for the period prescribed under Law, it may be deemed abandoned. The Bank may cease to pay interest (if any) on the Account, close the Account, and/or remit abandoned funds to the appropriate state authority. Escheatment requirements vary according to state Law and are determined by the state of the Customer's last known address of record with the Bank. The Bank is required to comply with such Law. If the Customer's last known address of record with the Bank is outside of the United States, Virginia Law will govern. Consecutive inactivity periods for determining actual requirements to turn funds over to a state vary depending on the abandoned property Laws of individual states and by Account type. There are specific abandoned property Laws regarding measurement of inactivity for CDs, including rules addressing Accounts that automatically renew. The Bank encourages the Customer to make sure its Accounts remain active so it has full use of its Accounts and avoids the potential of having its funds transferred to the state as unclaimed property. At any time after the funds in the abandoned Account

have been turned over to the appropriate state, the Customer (or other person entitled to the funds) may reclaim this money from the state abandoned property administrator.

5.2 The Customer will be responsible, at its expense and effort, for procuring, maintaining, and/or ensuring compatibility of any hardware, peripherals, third-party operating systems and any third party software necessary to support the operation of the Services.

5.3 The Bank and Customer will each use commercially reasonable efforts to prevent the spread of computer viruses by checking all of their respective computer systems, hardware and software used for transmission of data to the other party. This includes running a virus check program on the computer where the transmission of data to the other party will be originated.

## 6   Important Account Opening Information

6.1 To support the US Government in the fight against the funding of terrorism and money laundering activities, federal Law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an Account. When the Customer opens an Account, the Bank may ask for the Customer's beneficial owner(s) and its representatives' names, addresses, dates of birth and other information to verify the Customer's and its beneficial owner(s)' identities. The Bank may also ask for documentation confirming the Customer's existence as a legal entity and its applicable tax forms. If the Account is opened and the IRS subsequently notifies the Bank to withhold tax, or if the customer's tax form expires or becomes invalid due to a change in the Customer's tax status and is not replaced with a valid tax form or if withholding is otherwise required, the Bank will be required to withhold a portion of the amount of interest or other income or proceeds paid into the Account whenever such amount is credited to that Account.

The Bank complies with recording and record keeping requirements under The Bank Secrecy Act and may monitor the Account on a periodic basis for compliance. The Bank reserves the right to close any Account that attempts to avoid these requirements, as determined by the Bank.

The Bank is required to disclose certain transactions. The Bank may request information from the Customer and disclose information about its Account when the Bank believes it necessary or appropriate. The Bank may put a hold on the Account or refuse any transaction until the Customer provides sufficient information including, but not limited to:

(i)   Customers who purchase US dollar drafts (cashier's checks), foreign drafts for any amount; and

(ii)   transactions designed to evade US Government reporting requirements, including splitting transactions into smaller amounts. These may be subject to criminal penalties, including imprisonment, fines, or both. Cash withdrawals, cash deposits, currency exchanges and other cash payments or transfers exceeding $10,000 require the Bank to complete a Currency Transaction Report.

6.2 Unlawful Internet Gambling Enforcement Act 2006 prohibits any person engaged in the business of betting or wagering from knowingly accepting payment in connection with the participation of another person in unlawful Internet gambling. The Customer acknowledges that it is prohibited from processing such a transaction through its Accounts or banking relationship with the Bank.

6.3 The Telemarketing Sales Rule ("TSA") protects consumers from deceptive and/or abusive telemarketing practices. The Customer represents and warrants that the Customer will not engage in any such practice to the extent such Customer is subject to the

Document Number: CF-01US-210405-EN. HSBC Group © All rights reserved.



TSA.

6.4    Neither the Bank nor any other member of the Group will be
       liable to the Customer or any third party for any Loss incurred by
       the Customer or a third party in connection with the delaying,
       blocking or refusing of any payment or the provision of all or part
       of any Services or otherwise as a result of a Compliance Activity
       as defined in the MSA.

Document Number: CF-01US-210405-EN. HSBC Group © All rights reserved.

